**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN TURNBULL,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:07-cv-1470 |
| | ) | **Electronic Filing** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION

Plaintiff John Turnbull brought this action pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Presently before the court are cross-motions for summary judgment based on the record developed at the administrative level.  After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs of the parties, and the entire record, it is clear that the substantial evidence as a whole demonstrates only that plaintiff is disabled within the meaning of the Act.  Accordingly, Plaintiff's motion will be granted, Defendant's motion will be denied, and the matter will be remanded with direction to grant benefits consistent with an onset date of February 12, 2006.


## II.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on November 22, 2004, alleging disability as of September 30, 2004 due to spinal stenosis, achondroplasia dwarfism, back problems, left leg pain, anxiety, panic attacks, and depression.  (R. 14, 55-59, 69.)  The state agency denied his claim on February 14, 2005. (R. 32-36.)  At Plaintiff's request a hearing was held before ALJ Douglas W. Abruzzo on January 5, 2006 where Plaintiff, who was represented by counsel, and a vocational expert testified.  (R. 761-806.)  On May 8, 2006, the ALJ issued a decision finding Plaintiff not disabled. (R. 14-23.)  On September 1, 2007, the Appeals Council denied Plaintiff's request for review. (R. 6-8)  The instant action followed.

## III.   STATEMENT OF THE CASE

Plaintiff was born on July 22, 1963, making him forty-one years of age at the time of his asserted onset of disability and forty-two years of age on the date of the ALJ's decision. (R. 22.) This made him a younger individual within the meaning of 20 C.F.R. §1963(c).  Plaintiff has a high school education and four additional years of education at the college level. Id.  Plaintiff's past relevant work includes telemarketer, loan coordinator, auto salesman, sales representative, and office manager. Id.

Plaintiff was born with achondrodysplasia, commonly known as short-limed dwarfism.[1] (R. 189.)  In December of 1983, Plaintiff was in a motor vehicle accident and has experienced back pain since that time. (R. 260.)  Following the accident, Plaintiff underwent a fusion of the T12-L1-L2 vertebrae. (R. 260).  In 1999, Plaintiff had a laminectomy at L1-L5 performed by Dr. John Moossy. (R.260, 545).  Plaintiff also suffers from a neurogenic bladder and bowel problems which he controls with laxatives and medication. (R. 339-343).

Plaintiff was in a second car accident in September of 2001, which exacerbated his back pain. (R.260, 545). At that time, Plaintiff was referred to the Latrobe Area Hospital Pain Clinic by Dr. Michael Weinberg and received two treatments of epidural steroids in November of 2001. (R. 126-133). On November 28, 2001, Plaintiff reported to his pain clinic doctor that he was not receiving relief from the epidural steroids and the remaining treatments were cancelled. (R.125).

Plaintiff was seen for back pain from an assault/fall in the Latrobe Area Hospital on February 23, 2002,  and March 19, 2002. (R.157-58).  On May 12, 2002, an x-ray at the Latrobe Area hospital indicated that Plaintiff had "abnormalities in the pelvic and hip joints consistent with chronic paralysis." (R.156).

---

[1]Achondrodysplasia is caused by a mutation of the fibroblast growth factor receptor 3 gene that results in a gain-of-function state.  The primary defect is abnormal chondrocyte proliferation at the growth plate that causes development of short but proportionately thick long bones.  The disorder is manifest by the presence of short limbs (particularly the proximal portions), normal trunk, large head, saddle nose, and an exaggerated lumbar lordosis. See Harrison's Principles of Internal Medicine, 17th ed. (2008) at2414; The Merck Manual, 18th ed. (2006) at 2383-86.

On June 15, 2002, Plaintiff was seen at the Latrobe Area Hospital complaining of chronic back pain that radiated into his legs. (R.148). Plaintiff's pain physician at the time, Dr. John Horton of the Physical Medicine and Rehab Hospital, saw him on several occasions from January 2002 to August 2002. (R.164-187). At several of the later visits, Dr. Horton determined that Plaintiff was not complying with his pain contract. (R.164-187). Use of narcotic pain medication was discontinued. On August 14, 2002, Plaintiff requested a restoration of his narcotic medication and pain management. (R. 162). Dr. Horton denied the request because of Plaintiff's non-compliance with his pain contract. (R. 162).

On September 13, 2002, Plaintiff began treatment with a new pain specialist, Dr. Michael Toshok. (R. 305). Dr. Toshok prescribed Oxycontin and Oxycodone for Plaintiff's chronic low back pain to be used sparingly. (R. 305-307). He also referred Plaintiff to physical therapy. On November 11, 2003, Percocet was added to his medication regime. (R. 303). On April 2, 2003, Plaintiff complained of increased pain and Dr. Toshok increased his medications with the understanding that Plaintiff would not take more of them than prescribed. (R. 297). Dr. Toshok also suggested that Plaintiff discontinue his physical therapy if it was ineffective. (R. 297). On May 28, 2003, Plaintiff reported that the medications were allowing him to maintain his activities of daily living and that he was working full time. (R. 294).

On June 11, 2003, Plaintiff overdosed on Vicodin that were given to him by a friend and was admitted to Westmoreland Regional Hospital. (R. 262). The doctor suggested a drug rehabilitation program, but Plaintiff declined. (R. 264). On June 13, 2003, Plaintiff was admitted to the emergency room at Westmoreland Regional Hospital with elevated liver enzymes from excessive narcotic usage. (R.258-59). The doctor assessed that Plaintiff was not suicidal but had an adjustment disorder with disturbance of emotions and conduct secondary to chronic pain and an addiction to pain medications. (R.258-59). On June 14, 2003, Plaintiff was transferred to the University of Pittsburgh for treatment of his acute liver dysfunction secondary to acetaminophen toxicity. (R. 277).

On June 30, 2003, Dr. Toshok put Plaintiff on equal dosing of Oxycontin and Methadone. (R. 293). On July 7, 2003, Dr. Toshok told Plaintiff that he would no longer write prescriptions

for opiate analgesic medications because Plaintiff was attempting to barter for medication. (R. 292). On July 8, 2003, Plaintiff was admitted to Monsour Medical Center for withdrawal symptoms from his narcotic medications. (R. 311).

On October 3, 2003, Plaintiff was seen by Dr. Moossy, who had performed his prior laminectomy. Dr. Moossy reported that Plaintiff was suffering from the spinal canal narrowing associated with and expected from achondroplasia and superimposed C4-5 and C6-7 disc bulges with some canal stenosis at those levels. (R. 343). Dr. Moossy reported severe spinal stenosis at T12 due to complications from the first car accident. (R. 343). Dr. Moossy suggested a second decompression and fusion. (R. 343). However, Dr. Moossy qualified his recommendation by noting that "[he] did not believe that [the] operation [would in] any way help [Plaintiff's] back pain, but [he thought] it had some reasonable chance of regaining some of [Plaintiff's] improvement he had in his leg function after his lumbar decompression..." (R. 343).

On May 12, 2004, Plaintiff was again seen by Dr. Moossy. (R. 339). Dr. Moossy reported that Plaintiff's symptoms had plateaued and that he was still having burning in his legs and difficulty with bladder control. (R. 339). Plaintiff declined a third corrective surgery because he had only received two years of relief from the second surgery. (R.339). On September 1, 2004, Plaintiff overdosed on Oxycodone, but denied suicidal thoughts. (R. 349).

On November 11, 2004, Plaintiff filled out a questionnaire and reported that he lived alone in a three story home, did not depend on anyone else for care, could drive locally daily with extensions on the foot pedals, could take out the trash, could prepare meals, could run the vacuum, could grocery shop and load and unload two bags from the car, could do laundry with occasional stopping and resting, could walk 100 yards without stopping, could sit for 10-15 minutes before changing position, could carry 15-20 pounds, could dress and shower without resting, could take care of personal needs without reminders, could get along with people in authority, could go out in public without difficulty, was a member of a Pitt Alumni group and a church council, could plan his days, could adjust to changes in a daily schedule, could make decisions on his own, had no trouble getting along with supervisors, and had no trouble with workplace changes. (R.104-113.)

4

On January 21, 2005, Plaintiff was evaluated by Dr. Peter Saxman, a clinical psychologist. Dr. Saxman diagnosed plaintiff with major depression, moderate; personality disorder with narcissistic, obsessive-compulsive, and independent features; and anxiety disorder. (R.358.) He opined that Plaintiff was moderately limited in his ability to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attention, and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (7) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (8) respond appropriately to changes in the work setting; and (9) set realistic goals or make plans independently of others. (R.361-62.)

On February 1, 2005, Plaintiff was involved in a motor vehicle accident and was taken by ambulance to Latrobe Area Hospital. (R.449.) He complained of pain in his right eye and in his back, but could move his arms and legs. (R.451.) On March 28, 2005, Plaintiff was seen in the Emergency Department of UPMC Shadyside by Dr. Margaret Hsieh. (R.555.) Plaintiff's chief complaints were "neck and back pain." (R. 555.) Dr. Hsieh reported "some lumbar tenderness on palpitation with no midline step off." (R. 555.) She also reported that Plaintiff could ambulate without assistance and was neurologically intact. (R. 555). Plaintiff was given a two-day supply of Oxycontin after claiming that he ran out of medication and could not remember the name of his pain clinic. (R. 555). On April 3, 2005, Plaintiff was seen at the Latrobe Area Hospital emergency room complaining of chronic back pain. (R. 445). The examination of Plaintiff's back was normal. (R. 445). Plaintiff was given pain medication and discharged. (R. 446-7).

On April 4, 2005, Plaintiff returned to Latrobe's emergency room with complaints of back pain from a fall down the stairs. (R. 436). On examination, Plaintiff had midline back tenderness. (R. 436). An x-ray of Plaintiff's lumbar region showed a compression fracture and/or congenital deformity of the body of L1. (R. 441.) On April 16, 2004, Plaintiff was seen again at

the emergency room in Latrobe complaining of moderate back pain after running out of medication. (R. 430). Plaintiff was given a prescription for Percocet to last him until a follow-up appointment with Dr. Moossy. (R. 441). On April 19, 2004, Plaintiff was seen at the Mercy Jeannette Hospital emergency room for complaints of back pain. (R. 507). An x-ray of the lumbar region showed an old fracture of the first lumbar region. (R. 509). Plaintiff was given Toradol and a prescription of Percocet. (R. 445).

On April 20, 2005, Plaintiff was seen by Dr. Moossy as a consequence of his February 1, 2005 motor vehicle accident. (R. 382). Plaintiff complained of neck and lower back pain, but was still reluctant to undergo additional decompressive surgery. (R. 383). Dr. Moossey prescribed Oxycontin and Oxy IR and referred Plaintiff to a pain specialist, Dr. Edward Heres. (R. 382).

On May 1, 2005, Plaintiff was seen by Dr. Clifton Callaway in the UPMC Shadyside emergency room for back pain. (R. 564-5). Plaintiff was tender to palpitation mildly over the sacral region. (R. 564). Plaintiff was given a prescription for pain medication for three to four days, but was instructed that he needed to see a pain specialist or he would receive no further pain medications from the emergency department. (R. 565). On May 11, 2005, Plaintiff was seen by Dr. Edward Heres at the Pain Evaluation and Treatment Institute at the University of Pittsburgh. (R. 698-99). Dr. Heres reported that Plaintiff had "significant tender points over [the] cervical, thoracic, and lumbar spine." (R. 699). Plaintiff was diagnosed with chronic low back pain post-laminectomy. (R. 699). Dr. Heres prescribed Avinza and referred Plaintiff to the Intensive Pain Rehab Program. (R. 700). On May 20, 2005, Plaintiff was seen at the Latrobe emergency room complaining of back pain after falling down 2-4 steps. (R. 423). Plaintiff had midline lumbar tenderness. (R. 423). An x-ray of the lumbar region showed an L1 wedge deformity. (R. 428). Plaintiff was prescribed Percocet and discharged. (R. 426).

On May 23, 2005, Plaintiff was seen by Dr. Brian Cicuto at the Pain Evaluation and Treatment Center. (T. 696-7). Plaintiff was given information about the program and he advised Dr. Cicuto that Oxycontin was the only drug that relieved his pain. (R. 696). Dr. Cicuto stated that he would not prescribe that medication. (R. 696). On June 2, 2005, Dr. Moossy's associate

wrote a letter stating that Plaintiff should relocate to a new home as "he is unable to live in a home with stairs to a second floor requiring repetitive climbing. With his history of spinal stenosis, compression fracture, and a closed head injury this puts him at risk for additional falls and worsening of his injury." (R. 381).

On June 4, 2005, Plaintiff was again seen at the emergency room in Latrobe. (R. 417). Plaintiff had limited range of lumbar motion. (R.417). He requested and received a transfer to the mental health section for a mental health evaluation. (R. 416). Plaintiff was admitted and stayed in the hospital until his pain medication ran out. (R. 412). On June 6, 2006, Plaintiff was discharged, but returned the same day seeking more pain medication, which he received and was again discharged. (R. 413). On June 9, 2005, Plaintiff returned to the emergency room in Latrobe complaining of pain and had thoracic and lumbar tenderness. (R. 404). Plaintiff was refused further narcotic pain medication and left before the visit was complete. (R. 405).

On June 10, 2005, Plaintiff returned to the emergency room in Latrobe seeking narcotic pain medication. (R. 399). He was denied the medication and walked out. (R. 400). On the same date, Plaintiff was seen at the emergency room at UPMC Shadyside. (R. 575-6). On examination, Plaintiff was in no acute distress, rested comfortably, was able to sit up and get out of a chair without difficulty, had no focal tenderness, motor strength was intact, and he had normal gait. (R. 576). Dr. Moosey and Dr. Cicuto were contacted. Dr. Moosey indicated that he would only manage Plaintiff's care if surgery were indicated. (R. 578). Dr. Cicuto permitted Plaintiff to be prescribed three days of Oxycontin, but Plaintiff was instructed that if he took more medication than the correct dosages, he would be in violation of his pain contract. (R. 578). On June 16, 2005, Plaintiff was seen by Dr. Cicuto. (R. 694). Plaintiff was prescribed methadone and his dosages of Oxycodone were to be reduced over time. (R.695).

On July 10, 2005, Plaintiff was seen at the emergency room in Latrobe complaining of back pain, and reporting that he had run out of methadone and Oxyir, a narcotic pain reliever. (R. 395). Plaintiff was given Dilaudid and Toradol. (R. 396). On the same day, Plaintiff was seen at the emergency room at Mercy Jeannette Hospital complaining of back and buttocks pain from a fall. (R. 498). Plaintiff's father arrived and told staff that Plaintiff was drug seeking and

should receive no narcotic pain medication, as he had to be detoxed from Oxycontin. (R. 497).

On July 12, 2005, Plaintiff was seen again at the emergency room in Latrobe complaining of difficulty moving. (R. 387). Plaintiff's examination was normal and the physician was unable to reproduce Plaintiff's pain. (R. 387). He was diagnosed with depression. (R. 388). Plaintiff was discharged without receiving medication. (R. 386). On the same day, Plaintiff returned to Mercy Jeannette Hospital complaining of back pain. (R. 492). Plaintiff left before seeing a physician. (R. 489, 492).

On July 21, 2005, Plaintiff was seen by Dr. Cicuto. He noted that Plaintiff would likely require more surgery and the placement of an intra-thecal pump to deliver pain medication straight to the spine.[2] (R. 693). Plaintiff was referred for aqua therapy. (R. 423).

On August 17, 2005, Plaintiff went to see his occupational therapist and reported that he was working full-time with regular duties at Johnson Chevrolet. (R. 712). He reported that his present activities included going to Pirates' games and being active in church. (R. 712). He further reported no difficulties with personal hygiene, dressing, laundry, and light and heavy housekeeping. (R. 711). He reported independence with difficulty in grocery shopping and meal preparation. (R. 711).

On August 22, 2005, Plaintiff had an initial evaluation with In-Sync Rehabilitation Services. (R. 718). The physical therapist made objective findings that Plaintiff's ambulation was unremarkable, he experienced increased tightness in the paraspinal musculature[3], he experienced pain over the bilateral piriformis musculature[4], and he could touch his hands to the

---

[2]An intrathecal pump is a device used to deliver an "injection into the subarchnoid space." 3 J.E. Schmidt, Attorney's Dictionary of Medicine and Word Finder, I-180 (1997).

[3]Muscles associated with the spine, as the musculus erector spinal, musculus spinalis thoracis, etc. 4 J.E. Schmidt, Attorney's Dictionary of Medicine and Word Finder, P-71 (1997).

[4]A muscle of the hip. One end, the origin, is attached to the sacrum and nearby structures. The sacrum is the lower end of the spine, filling in the gap between the back ends of the hip bones. The other end of the muscle, the insertion is attached to the greater trochanter of the femur, a bony eminence of the back of the upper end of the thigh bone. Contraction of the muscle
(continued...)

floor with his knees fully extended. (R. 718). Plaintiff was treated with aquatic therapy and attended many sessions. (R. 719-28).

On September 1, 2005, Plaintiff was seen by Dr. Matthew A. D'Onofrio. Other than his back pain which was being managed by the pain clinic, Dr. D'Onofrio noted that all other systems were normal. (R. 551). On September 10, 2005, Plaintiff was seen at the emergency room at Mercy Jeanette Hospital complaining of back pain. (R. 484). On examination, plaintiff had back spasms, decreased range of motion, and vertebral point-tenderness. (R. 484). On the same date, Plaintiff was seen in the emergency room at Monsour Medical Center asking for Dilaudid. (R. 541). Plaintiff was given Ultracet and discharged. (R. 541, 546). On September 11, 2005, Plaintiff was seen at the UPMC Shadyside emergency room for leg pain. (R. 586). Dr. Clifton Calloway reported that Plaintiff had "numbness over his left anterior thigh and numbness over his buttocks." (R. 587). Plaintiff was given Oxycontin and discharged. (R. 588). On September 16, 2005, Dr. Cicuto continued Plaintiff's methadone, oxycodone, and Dilaudid. (R. 691-92).

On October 10, 2005, Plaintiff was admitted to UPMC Presbyterian Shadyside for complaints of back and left leg pain, numbness and weakness in his left leg. (R. 598). A lumbar MRI indicated moderately severe spinal canal stenosis of the entire lumbar spine and moderately severe degenerative disc disease at all levels. (R. 598).

On October 19, 2005, Plaintiff complained to Dr. Moossy of increased leg weakness. (R. 380). Plaintiff was prescribed Skelaxin, a muscle relaxant. (R. 381). On November 7, 2005, Plaintiff presented at Mercy Jeanette Hospital with withdrawal symptoms from his narcotic pain medication. (R. 477). On December 11, 2005, Plaintiff visited the UPMC Shadyside emergency room complaining of back pain with some left leg radiation from a slip and fall. (R. 662). Plaintiff was given Dilaudid at the emergency room and Oxycontin and OxyIR. (R. 667).

---

[4](...continued)
turns the thigh, and the leg laterally. This means that the foot of the right leg turns clockwise. It is innervated by the sacral plexus. 4 J.E. Schmidt, Attorney's Dictionary of Medicine and Word Finder, P-258 (1997).

On December 14, 2005, Plaintiff returned to UPMC Shadyside requesting more medication for back and leg pain. (R. 668). Upon consulting with Dr. Cicuto, who instructed not to give Plaintiff further pain medications, the emergency doctor was going to release Plaintiff. (R. 672). However, Plaintiff made three comments about harming himself and was then admitted for psychiatric evaluation. (R. 670).

On December 15, 2005, Plaintiff was seen at the pain clinic and Dr. Cicuto reiterated that he would provide no further narcotic analgesics. (R. 686). He further noted that "it is unfortunate that [Plaintiff] does not meet the criteria due to his deception to continue with chronic opoid analgesic use from my perspective. I do not believe this is a psuedo-addiction but just abuse." (R. 686).

On February 12, 2006, an assessment of Plaintiff's residual functional capacity was completed by Dr. Moossy. (R. 749). In the assessment Dr. Moossy indicated he has treated Plaintiff since 1995 and sees him one to four times per year. (R. 750). Dr. Moossy noted that Plaintiff can lift and carry 5-10 pounds frequently and 10-15 pounds occasionally, stand for a half hour without interruption, stand for 1-2 hours during a total work day, walk 15-20 minutes without interruption, walk one hour in an eight hour work day, sit for 15-30 minutes without interruption, sit less than two hours in an eight hour work day, and would be unable to alternatively sit and stand during an eight hour work day. (R. 751-52). He further assessed that Plaintiff could not climb, balance, stoop, kneel, crouch, crawl, or bend during the course of an eight hour work day. (R. 752). Additionally, he opined that Plaintiff could only occasionally reach, handle, and finger and could never push/pull with his upper or lower extremities. (R. 753). Plaintiff was also to avoid all exposure to extreme temperatures, humid conditions, vibration, and hazards. (R. 753). Dr. Moosy wrote that a person in Plaintiff's position would normally experience pain because "[he] has a severely limited spinal canal due to congenital condition and the super-imposed problems of major trauma to the spine..." (R. 754). Further, Dr. Moossy wrote that Plaintiff could not work eight hours in a work day because "[h]e is using high doses of narcotics which provide only partial pain relief and has caused some problems with personal interactions with his family, work place, and physicians." (R. 754). Dr. Moossy was asked what

clinical findings supported his conclusions to which he responded: "his stature and physiology make the diagnosis of achondroplasia. His imaging studies confirm his L1 [fracture] and his severe total spinal stenosis. His behavior supports [a finding] of tolerance to medication." (R. 756).

At the hearing Plaintiff testified he did not work for more than three months after September 30, 2004 and did some volunteering for four to six hours a month through his church. (R. 774). He also testified that he was prone to anxiety, panic attacks, and depression, but was not on any psychotropic medications. (R. 777-78). Plaintiff further testified that he was in a pain clinic for his back and was going to aqua and physical therapy three times a week. Nevertheless, his back pain was getting steadily worse. (R. 779-80). Plaintiff testified that his left leg was getting more numb as time progressed, he was losing function in his left foot, and his hands were feeling arthritic. (R. 783). Plaintiff also testified that he was receiving acupuncture and laser treatments and that they were providing some relief. (R. 792).

In his opinion, the ALJ concluded that Plaintiff had not been under a disability as defined in the Act from September 30, 2004, through the date of the decision. (R. 23). The ALJ determined that Plaintiff had the following medically determinable "severe" impairments: congenital dwarfism; spinal stenosis; lower back pain, status post three surgeries; and opiate dependence. He determined that Plaintiff's neurogenic bowel/bladder disorder, status post three surgeries, depression, anxiety, and personality disorder were not "severe." (R. 17). He further determined that Plaintiff had the residual functional capacity to engage in light work that involves occasional stooping, crouching or crawling; avoids ladders, ropes or scaffolds; affords a sit/stand/walk option that permits the claimant to take four or five steps away from his workstation, during a one minute period, up to five times an hour (for sedentary jobs only); involves no more than occasional pushing and/or pulling with the lower extremities, including the operation of pedals, unless the pedals require less than five pounds of force to operate; avoids prolonged exposure to cold temperature extremes, vibration (that exceeds that encountered when riding in a car), extreme wetness or humidity; does not require exposure to dangerous machinery or unprotected heights; involves no more than simple, routine, repetitive tasks and requires only

simple, work-related decisions. (R. 18-19).

In support of his determination that Plaintiff is not disabled the ALJ relied on the "limited credibility" of Plaintiff's testimony concerning his impairments, due to his daily activities, life style, and the medical evidence of record. (R. 20). In support of this proposition the ALJ reasoned that Plaintiff's congenital dwarfism did not prevent him from engaging in substantial gainful activity prior to September 30, 2004, and emphasized that he was thereafter abusing his pain medication. (R. 20).

The ALJ also discounted the opinion of Dr. Saxman who concluded that Plaintiff had moderate limitations due to his pain and depression. (R. 20). The ALJ reasoned that Dr. Saxman's opinion should be given limited weight because his summary of the examination suggested that Plaintiff might be functioning at a higher level than Dr. Saxman indicated. (R. 20).

The ALJ also rejected most of Dr. Moossey's opinions, citing in support Plaintiff's ability to live independently and perform a wide range of daily household activities, his non-specificity in the frequency or duration of rest breaks, two emergency room visits where the emergency room doctor had difficulty reproducing Plaintiff's pain, and the fact that Plaintiff decided to forgo additional surgery. (R. 21). The ALJ therefore found that Dr. Moossey's assessment and work-related limitations were not well-supported by the totality of the evidence. (R. 21).

## IV.    STANDARDS OF REVIEW

The Commissioner's findings and conclusions leading to a determination that a claimant is not "disabled" must be supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971); Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988). The task of this court in reviewing the decision below is "to determine whether there is substantial evidence on the record to support the ALJ's decision." Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Aphel, 225 F.3d 310, 316 (3d Cir. 2000)(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

As the fact finder, the administrative law judge ("ALJ") has an obligation to weight all

the facts and evidence of record and may accept or reject any evidence if the ALJ explains the reasons for doing so.  Plummer, 186 F.3d at 429.  This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  And where the findings of fact leading to the decision of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently.  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2000).  But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further proceedings.  Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).  A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the claimant is disabled and entitled to benefits.  Id. at 221-22.

## IV.    DISCUSSION

Plaintiff argues that the ALJ did not give appropriate weight to the opinions of Dr. Moossy, Plaintiff's treating neurologist, and those of the consulting pain specialists, Drs. Herres and Ciuito, whose assessments clearly augment and further support Dr. Moossy's opinions and assessments.  In addition, Plaintiff asserts that the ALJ erred in relying on none-medical evidence to discount the opinions and assessments of the treating and consulting physicians, and in failing to consider Plaintiff's long and consistent work history when passing on Plaintiff's complaints of pain and disfunction.  Finally, Plaintiff argues that the ALJ did not accurately set forth Plaintiff's work-related limitations in his hypothetical questions to the vocational expert.  The Defendant posits that the ALJ's determination was supported by substantial evidence.

The ALJ failed to accord proper weight to the opinions and assessments of the treating and consulting physicians.  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. Gordils v. Secretary of Health and Human Services, 921 F.3d 327, 328 (1ˢᵗ Cir. 1990) (citing Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 223 (1ˢᵗ Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. See Reid v. Chater, 71 F.3d 372, 374 (10ᵗʰ Cir. 1995) (examining physician's report accorded significant weight where it was only medical assessment on point and corroborated by other evidence). Similarly, examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. See Magallanes v. Bowen, 881 F.2d 747, 751 (9ᵗʰ Cir. 1989).

The ALJ failed to give proper weight to the assessments of plaintiff's treating neurolist, Dr. Moossy. Dr. Moossy made unequivocally clear his opinion that Plaintiff was unable to meet the physical demands of an 8 hour work day. The ALJ rejected almost all of Dr. Moossy's physical capacity assessments in his report of February 22, 2006. In that report Dr. Moossy noted that he has been treating Plaintiff since 1995 and sees him one to four times per year. (R. 750). Based on this long record of treatment Dr. Moossy determined that Plaintiff could not meet the minimal combination of sitting, standing and walking required to complete an 8 hour day.[5]

---

[5]Dr. Moossy specifically indicated that during an eight hour day plaintiff can lift and carry 5-10 pounds frequently and 10-15 pounds occasionally, stand for a half hour without interruption, stand for 1-2 hours during an eight hour work day, walk 15-20 minutes without interruption, walk one hour in an eight hour work day, sit for 15-30 minutes without interruption, sit less than two hours in an eight hour work day, and would be unable to alternatively sit and stand during an eight hour work day. (R. 751-52). He further assessed that Plaintiff could not
(continued...)

Dr. Moosy further explained that a person in Plaintiff's position would normally experience pain because "[he] has a severely limited spinal canal due to congenital condition and the super-imposed problems of major trauma to the spine..." (R. 754). Furthermore, Plaintiff could not work eight hours in a work day because "[h]e is using high doses of narcotics which provide only partial pain relief and has caused some problems with personal interactions with his family, work place, and physicians." (R. 754). When asked what clinical findings supported his conclusions, Dr. Moossy further explained that "his stature and physiology make the diagnosis of achondroplasia. His imaging studies confirm his L1 [fracture] and his severe total spinal stenosis. His behavior supports [a finding] of tolerance to medication." (R. 756). These of course are well documented impairments and conditions that have been medically confirmed repeatedly by medical history, laboratory testing, examination and clinical evaluation.

As stated above, the ALJ gave virtually no weight to the assessments of Dr. Moossy on the grounds that Plaintiff's daily activities, his testimony about the need for rest breaks, two visits to the emergency room, and Plaintiff's decision to forgo further surgery all contradicted Dr. Moossy's findings and assessments. Of course, none of these sources provide competent contrary medical evidence and thus the ALJ was without justification to engage in such a wholesale rejection of plaintiff's long-term treating neurologist. Such error is in itself a sufficient basis for reversal of the decision below. See Plummer, 186 F.3d at 429 ("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.") (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir.1985); accord Brownawell v. Commissioner Of Social Security, 554 F.3d 352, 355 (3d

---

[5](...continued)
climb, balance, stoop, kneel, crouch, crawl, or bend during the day. (R. 752). Additionally, he opined that Plaintiff could only occasionally reach, handle, and finger and could never push/pull with his upper or lower extremities. (R. 753). Plaintiff also was to avoid all exposure to extreme temperatures, humid conditions, vibration, and hazards. (R. 753). These limitations reflect a residual functional capacity that would not meet the requirements of substantial gainful activity at any exertional level.

Cir. 2008) (same).

Moreover, close consideration of each ground advanced by the ALJ for substantially discounting Dr. Moossy's opinions and assessments demonstrates the speculative nature of the ALJ's reasoning. The ALJ's reasoning that Plaintiff's decision to forgo surgery had a bearing on the weight to be given to Dr. Moossy's opinion was unsupported. Plaintiff's decision to forgo surgery had no reliable correlation to whether he actually was in significant pain and lacked the abilities generally associated with working an eight-hour day or whether he was avoiding a form of treatment that would provide him with relief. Plaintiff had endured two complicated surgeries with very limited success. And although the ALJ inferred that Plaintiff could have voluntarily relieved the pain by choosing an additional surgery, an earlier visit with Dr. Moossy specifically dispelled this notion. On October 3, 2003, Moossy indicated that "[he] did not believe that [the] operation [would in] any way help [Plaintiff's] back pain, but [he thought] it had some reasonable chance of regaining some of [Plaintiff's] improvement he had in his leg function after his lumbar decompression..." (R. 343). In other words, the surgery would not have provided relief from much of the pain caused by the ongoing narrowing of Plaintiff's spinal canal from his achondroplasia, severe total spinal stenosis, and severe disc disease. It would only have provided possible relief from the growing disfunction in the lower extremities, particularly the left leg, and thereby lessen Plaintiff's proclivity to fall repeatedly and further exacerbate his chronic lower back pain syndrome.

The ALJ's reliance on two of Plaintiff's visits to the emergency room as evidence of Plaintiff's ability to perform light work likewise was without logical foundation. The first visit occurred on July 12, 2005, when Plaintiff was seen at Latrobe Area Hospital and had "a normal exam" during which the physician was unable to reproduce Plaintiff's pain. (R. 387). The second occurred on December 14, 2005, when an emergency room doctor reported that Plaintiff had minimal tenderness of the lumbar spine and refused to give him medication. (R. 668). While these two individualized episodes did not indicate the level of pain reported by Dr. Moossy, the emergency room physicians were not Plaintiff's treating physicians and lacked any long-term, longitudinal understanding of Plaintiff's impairments. In contrast, Plaintiff has been seen by Dr.

Moossy one to four times per year since 1995. And the reports of other doctors, MRI records, x-rays, and the treatment records from a number of other emergency room doctors repeatedly substantiated the bases for Plaintiff's back and/or leg pain and thus provided further support for Dr. Moossy's report. For example, a May 12, 2002, x-ray indicated Plaintiff had "abnormailities in the pelvic and hip joints consistent with chronic paralysis." (R. 156). On March 28, 2005 and April 4, 2005, Plaintiff's emergency room physicians reported that Plaintiff had midline lumbar tenderness. (R. 436, 555). An x-ray on April 4, 2005, confirmed that Plaintiff had a compression fracture and congenital deformity at L1. (R. 441). An x-ray on April 19, 2005 also showed the compression fracture of the first lumbar region. (R. 509). On May 11, 2005, Dr. Heres, one of Plaintiff's pain specialists, reported that Plaintiff had "significant tender points over [the] cervical, thoracic, and lumbar spine." (R. 699). Plaintiff once again was found to have midline lumbar tenderness at the emergency room on May 20, 2005. (R. 423). An x-ray taken at that time revealed an L1 wedge deformity. (R. 428). On June 2, 2005, Dr. Moossy's office authored a letter indicating that Plaintiff was unable to live in a home with stairs because he could no longer safely climb them and the office was concerned about further injury from falls. (R. 381). An emergency room physician once again noted a limited range of lumbar motion on June 4, 2005, and there was a similar finding on June 9, 2005. (R. 404, 417). On August 22, 2005, Plaintiff's physical therapist made objective findings that Plaintiff had experienced increased tightness in the paraspinal musculature. (R. 718). At the emergency room on September 10, 2005, it was reported that Plaintiff had back spasms, decreased range of motion, and vertebral point-tenderness. (R. 484). And on October 10, 2005, an MRI indicated moderately severe spinal canal stenosis of the entire lumbar spine and moderately severe degenerative disc disease at all levels. (R. 598).

Even if the above were not enough, Plaintiff's suffers from a congenital deformity in his arm. (R. 357). He also suffers from numbness and decreased range of motion in his left leg. As early as October of 2003, Dr. Moossy indicated that Plaintiff was suffering from decreased leg function. (R. 334). Dr. Moossy reported in May of 2004 that Plaintiff was having problems with burning in his legs. (R. 339). Additionally, Plaintiff's physical therapist indicated that Plaintiff

was experiencing pain over the bilateral piriformis musculature. (R. 718). On September 11, 2005, Dr. Calloway at UPMC Shadyside indicated that Plaintiff had numbness over the left anterior thigh and over his buttocks. (R. 586). On October 19, 2005, Plaintiff complained of increased leg weakness to Dr. Moossy who in turn prescribed him a muscle relaxant. (R. 381).

In addition, there is significant medical support for Dr. Moossy's assessments and opinions. Achondrodysplasia is known to cause severe spinal deformity that may lead to cord compression. Harrison's Principles of Internal Medicine at 2414; The Merck Manual at 2385. Spinal cord injury or impairment between T11 and T12 can cause paralysis of leg muscles above and below the knee; at T12 to L1 paralysis below the knee; at cauda equina (spinal nerves below the lower tip of the spinal cord at the L1 level) hyporeflexic or areflexic parasis of the lower extremities and usually pain and hypersthesia in the distribution of the nerve roots; and at S3 to S5 or conus medullaris at L1 the loss of bowel and bladder control. The Merck Manual at 2579-81. In addition, both severe degenerative disc disease and lumbar spinal stenosis are known to cause sciatica and other forms of chronic low back pain which can radiate into the buttocks and leg. See Harrison's Principles of Internal Medicine at 110-112; The Merck Manual at 327-28, 323, 295. Sciatica is known to produce symptoms of pain, sometimes severe, in the low back and radiating from the buttocks into the leg. The Merck Manual at 327. Test results lending credence to plaintiff's complaints of pain included the x-rays showing the compression fracture at L1 and the MRIs showing severe degenerative changes and progressive narrowing of the lumbar spinal canal. See e.g. Harrison's Principles of Internal Medicine at 115; Professional Guide to Diseases, 17th ed. (2001) at 601; The Merck Manual at 327-29. Motor vehicle accidents are a major cause of injuries to the spine and spinal cord. The Merck Manual at 2579.

Against this backdrop it was error to reason that two emergency room visits where minimal or no pain was reproduced can constitute substantial evidence to overcome the breadth of medical evidence supporting Dr. Moossy's findings, assessments and opinions. It is simply too well settled that an ALJ is not free to rely on a few isolated and selective excepts from the medical evidence to inform his assessment of a plaintiff's residual functional capacity. See Kent, 710 F.2d at 114 (A single piece of evidence is not substantial where it is overwhelmed by other

evidence or if it is not evidence but mere conclusion.); <u>Cotter v. Harris</u>, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record."). The ALJ's efforts to extrapolate from these two visits a sound basis for discounting the specific assessments made by Plaintiff's long term neurologist lacks logical appeal. And given the corroborating medical information contained in the treating records of Plaintiff's pain management specialists, it is clear that the ALJ's rejection of Dr. Moossy's findings, assessments and opinions on the basis of the treatment notes from these two visits cannot stand.

Plaintiff's activities of daily living likewise did not warrant the ALJ's rejection of the overwhelming and solidly supported medical evidence establishing Plaintiff's disability. The ALJ surmised that Plaintiff's daily activities and testimony regarding his need for rest breaks supported the dismissal of Dr. Moossy's findings. The ALJ noted that Plaintiff "is able to live independently and perform a wide range of daily household activities." Plaintiff can drive, shop, cook, pay bills, clean, take out trash, wash laundry, vacuum, dust, sweep, mop, and wash dishes. He also is involved with his church and an alumni group. In addition, the ALJ was critical of Plaintiff not specifying how long of a break he needed when resting between activities.

While Plaintiff freely admitted he could perform many household chores, such activity in itself does not supply the grounds for dismissing Dr. Moossy's medical opinion and the import of the records from the consulting specialists. It is well-settled that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." <u>Wright v. Sullivan</u>, 900 F.2d 675, 682 (3d Cir. 1990) (<u>quoting</u> <u>Smith v. Califano</u>, 637 F.2d 968, 971 (3d Cir. 1981)). To the contrary, the ability to engage in "sporadic or transitory activity does not disprove disability" and may well indicate merely that the claimant is only partially functional on a periodic basis. <u>Id</u>. Here, when the record is closely reviewed as a whole, an inference of partial functionality is all that can be drawn from plaintiff's efforts to remain independent and engage in social events such as church or alumni gatherings. Furthermore, it was improper for the ALJ to put significant weight on the fact that Plaintiff never testified to the exact length of breaks he required between performing activities as the ALJ was free to ask and

had a duty to inquire about such matters but never posed an appropriate question to Plaintiff.  See

Sims v. Apfel, 530 U.S. 103, 103-4 (2000) (As a general matter proceedings before the

Administration are "inquisitorial rather than adversarial" in nature and consequently the

presiding ALJ has a "duty to investigate the facts and develop the arguments both for and against

granting benefits" before undertaking a final evaluation of the record).

Finally,  the ALJ erred in substantially discounting Plaintiff's complaints of pain, finding

his testimony "not totally credible."  (R. 20).   The Act recognizes that under certain

circumstances pain in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall
> alone not be conclusive evidence of disability ...; there must be
> medical signs and findings, established by medically acceptable
> clinical or laboratory diagnostic techniques, which show the
> existence of a medical impairment that result from anatomical,
> physiological or psychological abnormalities which could
> reasonably be expected to produce the pain or other symptoms
> alleged and which, when considered with all evidence
> required to be furnished under this paragraph (including
> statements of the individual or his physician as to the
> intensity and persistence of such pain or other symptoms
> which may reasonably be accepted as consistent with
> the medical signs and findings), would lead to a
> conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A);  Green v. Schweiker, 749 F.2d 1066 (3d Cir. 1984).  The United

States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by

district courts when reviewing assessments  of the Commissioner on subjective pain: (1)

subjective complaints of pain are to be seriously considered, even where not fully confirmed by

objective medical evidence; (2) subjective pain may support a claim for disability benefits and

may be disabling; (3) when such complaints are supported by medical evidence, they should be

given great weight; and finally, (4) where the claimant's testimony as to pain is reasonably

supported by medical evidence, the ALJ may not discount the pain without contrary medical

evidence. Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985).

The record is replete with references to the serious pain to be expected from the natural

progression of Plaintiff's  achondroplasia, his severe total spinal stenosis and severe disc disease

at all levels. Virtually every doctor that treated or examined Plaintiff for these conditions acknowledged the pain created by them through their ongoing pain management treatments, physical therapy and the prescribing of serious narcotic medications. Emergency room doctor after emergency room doctor gave plaintiff prescriptions for strong narcotic pain medications or other medications used to treat severe pain, including Oxycontin, Oxyir, Dilaudid, Percocet, Ultracet and Toradol. He also was routinely given muscle relaxers. Except for a few emergency doctors, no treating physician doubted or questioned the degree of pain Plaintiff claimed to experience and their efforts at treatment consistently verified the severity of pain that would be expected from Plaintiff's impairments.

Other than citing to a purported lack of medical evidence to support his assessment of Plaintiff's credibility, the ALJ relied on what was referenced as Plaintiff's "well-documented history of narcotic abuse." The record does contain several instances of Plaintiff engaging in what was characterized as drug-seeking behavior. But the objective medical evidence fails to support the notion that Plaintiff's behavior was driven by a need simply to obtain narcotics for the purpose of drug addiction. To the contrary, it repeatedly demonstrates that Plaintiff suffers from severe pain and debilitating symptoms and relies on medication for relief. It also repeatedly demonstrates that Plaintiff's ongoing need for such medications has elevated his tolerance to such medications and diminished their effectiveness. In this regard Dr. Moossy was of the opinion that Plaintiff had built up a tolerance to his medications, and that he had ceased getting significant relief from them. Further, Dr. Cicuto stated "it is unfortunate that [Plaintiff] does not meet the criteria due to his deception to continue with chronic opoid analgesic use from my perspective. I do not believe this is a psuedo-addiction but just abuse." (R. 686). In other words, Plaintiff continued to seek the drugs because he was taking excessive amounts in a effort to decrease his pain and not because he merely sought to obtain drugs for an illegitimate purpose. Tellingly, both Doctors Cicuto and Moossy continued to prescribe strong and addictive narcotic pain medications repeatedly even after Plaintiff's abusive behavior had come to light. They sought to control the side effects from the pain medication by prescribing methadone. Thus, the medical evidence and the assessments of the treating physicians demonstrate clearly that Plaintiff

had a legitimate need for such strong narcotic medications notwithstanding his failure to conform his use of such medication to the guidelines prescribed.

In short, the ALJ did not adequately evaluate the record in reaching his finding that Plaintiff was addicted to narcotics and therefore his complaints of pain and claims of functional limitation lacked persuasive credibility. It is clear that Plaintiff had a high tolerance to narcotic medication. Further, although there is significant evidence throughout the record that Plaintiff over-used narcotic medication, time and again he continued to receive the medications from doctors who documented his problems with both severe pain and medication abuse and thereby recognized his need for such strong medications.

There is substantial evidence throughout the record that Plaintiff suffers from a great deal of pain and use of such strong, addictive narcotic medications continues to be necessary and warranted medically. Because there were medical bases for Plaintiff's complaints and the treating sources did not doubt the existence of Plaintiff's pain, the ALJ erred in failing to accord proper weight to this aspect of the record. See Stewart v. Sullivan, 881 F.2d 740 (9th Cir. 1989) (it is error to reject consistent evidence of excess pain on the ground that it is not supported by objective medical findings where there is medical evidence to support the existence of some pain); Ferguson v. Schweiker, 765 F.2d 31 (3d Cir. 1985) (where claimant's testimony as to pain reasonably is supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence; and where the complaints are supported by medical evidence, they are to be given great weight).

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week. Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work

22

activities on a systematic and sustained basis. Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act. Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity. Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979). Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of February 12, 2006, when Dr. Moossy indicated that the limitations from Plaintiff's progressive impairments prevented him from meeting the demands of substantial gainful activity on a regular and sustained basis. Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence. As a result, Plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of February 12, 2006.

An appropriate order will follow.


Date: March 12, 2009


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Karl E. Osterhout, Esquire
        1789 South Braddock Avenue
        Suite 570
        Pittsburgh, PA 15218

        Jennifer Andrade
        Assistant United States Attorney

23